**Edward J. GUAY and Lorraine K. Guay co-executors of the Estate of George A. Moura, Plaintiffs,**

v.

**The MASTERS, MATES AND PILOTS PENSION PLAN et al., Defendants.**

**No. 75 Civ. 1363.**

United States District Court, S. D. New York.

May 27, 1977.

Clifton Budd Burke & DeMaria by Alfred T. DeMaria, Kevin J. McGill, New York City, for plaintiffs.

Proskauer, Rose, Goetz & Mendelsohn by Bettina B. Plevan, New York City, for defendants.

OPINION

ROBERT L. CARTER, District Judge.

Defendants have moved pursuant to Rules 12(b)(6) and 56(b), F.R.Civ.P., for dismissal of the complaint or for summary judgment. Plaintiffs have cross-moved pursuant to Rule 56, F.R.Civ.P., for summary judgment. Oral argument on the motions was held May 4, 1977.

*Facts*

George Moura worked as a licensed deck officer in the American Merchant Marines from 1945 until 1965, at which point he retired. Under the applicable provisions of the Rules and Regulations of the Masters, Mates & Pilots Pension Plan ("the Plan"), Moura was credited with the maximum years of service (20), and was entitled to a $300 per month pension. In 1966, Moura returned to work in the maritime industry,

and pension benefits to him thus ceased.[1] (The cessation of pension benefits on Moura's return to work is not in dispute.)

On November 14, 1966, defendant Maher, Administrator of the Plan, wrote to Moura (in response to a written request by Moura), stating that the Board of Trustees of the Plan had approved Moura's request to be allowed to return to "covered employment" as a licensed deck officer. Attached to this letter was a copy of the Plan regulations governing reemployment of pensioners.

On November 25, 1966, shortly after Moura had returned to covered employment, he wrote to Maher asking whether he would be entitled to the "wage-related" benefits available to qualified employees under Article II–A of the Plan. Article II–A had been adopted in August, 1966, shortly before Moura began working again. Pensions under Article II–A are partially tied to an employee's wage rate, and pension benefits may be significantly higher under Article II–A than under the standard pensions (Article II) provided by the Plan pursuant to which Moura had earlier received benefits.[2] On December 14, 1966, Maher wrote Moura and informed him that he would not be eligible for an Article II–A pension, since it covered only those employees whose *initial* retirement occurred after June 16, 1968 (the date Article II–A went into effect). Nevertheless, Moura continued working as a merchant marine.

In March, 1975, Moura filed the original complaint in this action. An amended complaint was filed on September 23, 1975. The amended complaint sought an injunction and a declaratory judgment that upon retirement Moura was entitled to an Article II–A pension. It was alleged that the refusal of the Plan's Trustees to accord Moura Article II–A pension credits for the period of his 1966–1975 employment constituted a breach of the Trustees' fiduciary duties, violated two federal statutes and

was contrary to the express provisions of the plan. In the alternative, the complaint sought return of all the contributions made to the fund by Moura's employer in the ten years between 1966 and the date the complaint was filed.

In May of 1976, Moura died. On October 4, 1976, the attorneys for all parties entered into a stipulation substituting Edward J. Guay and Lorraine K. Guay, the co-executors of Moura's estate, as plaintiffs in this case, and dismissing with prejudice the First and Third claims for relief. These claims dealt with the demand by Moura for an Article II–A monthly pension and were obviously no longer relevant. The remaining claims for relief deal with the plaintiffs' demand for a return of the contributions made by Moura's employer to the fund.

## Discussion

Plaintiffs contend that the defendants wrongfully denied Moura pension credits under Article II–A, but nevertheless collected contributions from Moura's employer. Plaintiffs assert that "since the Trustees had no right to collect those funds without according [Moura] pension credits, the Trustees have no justification for retaining those contributions in the corpus of the fund." Pls.' Mem., at 6. Plaintiffs assert further that between Moura, without whose labor these employer contributions would never have been made, and the fund, Moura (i. e., his estate) has the better claim to these contributions. Plaintiffs urge the court to declare a constructive trust in their favor consisting of these contributions, or to order restitution of the money.

It is unnecessary, however, to reach the substance of plaintiffs' argument. The act which plaintiffs contend harmed Moura was the Trustees' allegedly wrongful denial to him of Article II–A eligibility. Yet, as plaintiffs' counsel conceded at oral argu-

---

1. Plaintiffs assert that Moura returned to work on the urging of "maritime industry sources [with] the concurrence of the defendant Trustees." Pls.' 9(g) statement, ¶ 3. Defendants disagree with this characterization of events. Defs.' counter 9(g) statement, ¶ 2.

2. Plaintiffs assert that at the time the complaint was filed, Moura would have been entitled to a pension of approximately $600 per month under Article II–A, whereas under Article II he would have been entitled to only $300 per month. Cmplt. ¶ 53.

ment, had the Trustees not denied Moura Article II–A status, plaintiffs would now have no claim against the pension fund, since retirement is a prerequisite to the payment of pension benefits. *See* Plan, Article IV, Section 1. Thus it is clear that the Trustees' actions caused Moura no harm whatsoever, whether they were wrongful or not. Indeed, if anyone has been harmed by what occurred, it is not Moura or his estate, but Moura's employer, who, unlike Moura, actually contributed money to the pension fund. Moura's employer, though, has at no time contended that any payment it made to the fund was wrongfully accepted, and is not even a party to this litigation.[3]

One contention made by plaintiffs, though deficient, merits some consideration. Plaintiffs assert that the contributions made to the pension fund were made on Moura's behalf, and were made by the employer in lieu of higher wages to Moura. To a limited extent plaintiffs are certainly correct in this. If an employer is willing to contribute to a pension fund an amount of money based on the numbers of hours worked by its employees, in the absence of a fund the employer should be willing to pay the employees a higher hourly wage. *See, e. g. Bey v. Muldoon,* 223 F.Supp. 489, 495 (E.D.Pa.1963), *aff'd* 354 F.2d 1005 (3d

Cir. 1966). *But see United States v. Embassy Restaurant, Inc.,* 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959).

That is not to say, however, that an employee has any direct interest in the contributions of his employer.[4] In fact, the law of this circuit and others makes clear that an employee has no title or interest in pension funds until the time that his rights have vested. *See, Schneider v. McKesson & Robbins, Inc.,* 254 F.2d 827 (2d Cir. 1958); *Assalone v. Carey,* 154 U.S.App.D.C. 69, 473 F.2d 199 (1972). Moura's rights had not vested here, since he had not retired at the time of his death, and thus he can assert no title or interest in his employer's pension contributions.

Because plaintiffs can show no injury that they have suffered as a result of the acts challenged here, they have no standing to raise the issue of the propriety of the defendants' denial of Moura's request for Article II–A pension status. Summary judgment is therefore granted in favor of defendants.[5]

IT IS SO ORDERED.

---

**3.** Under the Plan, an employee's survivors have some rights to pension benefits. Thus it is possible that Moura's survivors, as distinguished from his estate, may have been harmed by the Trustees' determination concerning Moura's pension status. Moura's survivors, however, are also not parties to this suit, and thus their rights are not at issue here. Indeed, as I understand it, Moura's survivors have no grievance respecting what they have been paid by the Plan.

**4.** Although employer contributions are pegged to a certain extent to the amount of hours worked by an individual employee, it should be noted that there is no direct correlation between the amount of employer contributions per employee and the rate at which these employees are paid when they become pensioners. This is so because the level of employer contributions is determined by actuarial statistics, and because, as indicated in the text, only employees whose rights have vested are entitled to receive pension moneys.

**5.** Plaintiffs contend that both the Labor Management Relation Act and the Employee Retire-

ment Income Security Act require the trustees of a pension fund to use employer funds for the sole and exclusive benefit of the employees, and that by accepting funds without crediting for pension purposes the employee on account of whom the funds are contributed, the trustees have violated their fiduciary obligations. The court need not reach this argument. It is worthwhile indicating, however, that in so framing the issue, the plaintiffs appear to have skirted the real controversy—whether the Trustees' interpretation of Article II–A's eligibility requirements was within the bounds of their discretion. The Plan itself grants wide discretion to the Trustees in interpreting its rules, *see* Article II–A, Section 15, and the only question that must be answered is whether the Trustees acted arbitrarily or in bad faith in interpreting Article II–A as providing benefits for only those individuals whose initial retirement was after Article II–A's effective date. *See Beam v. International Organization of Masters, Mates & Pilots,* 511 F.2d 975 (2d Cir. 1975).